2011 ME 80

**STATE of Maine**

v.

**David ARCHER.**

Supreme Judicial Court of Maine.

Argued: June 15, 2011.
Decided: July 14, 2011.

Verne E. Paradie, Jr. (orally), Trafton & Matzen, LLP, Auburn, ME, for David Archer.

R. Christopher Almy, District Attorney, Susan J. Pope, Asst. Dist. Atty. (orally), Prosecutorial District V, Bangor, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

ALEXANDER, J.

[¶ 1] David Archer appeals from convictions for attempted murder (Class A), 17–A M.R.S. §§ 152(1)(A), 201(1)(A) (2010), and elevated aggravated assault (Class A), 17–A M.R.S. § 208–B(1)(A) (2010), entered by the Superior Court (Penobscot County, *Anderson, J.*) following a jury trial.[1] Archer challenges the court's actions: (1) overruling his objection to medical testimony that referenced facts and opinions in a report of a non-testifying physician; (2) allowing testimony by Archer's mother that, hours before Archer stabbed the victim, he displayed a knife at his mother's house and threatened to kill the victim; and (3) denying his request to introduce the complete recordings of eight telephone conversations he had with his mother while he was incarcerated. We affirm the judgment.

## I. CASE HISTORY

[¶ 2] The record indicates the following history, including facts that the jury could have found supported the convictions beyond a reasonable doubt. *See State v. Caron,* 2011 ME 9, ¶ 2, 10 A.3d 739, 741.

[¶ 3] Beginning in February 2008, David Archer and the victim dated for approximately six to eight weeks. The victim terminated her relationship with Archer in April 2008 and began seeing another man. On the morning of April 26, 2008, in Bangor, Archer saw the victim from a distance and began hollering to her, indicating that he wanted to speak with her. The victim did not speak with Archer. Throughout the day, Archer sent her numerous text messages, expressing his continued love for her and his desire for the two of them to be reunited.

[¶ 4] In the afternoon, Archer visited his mother in Brewer. Archer indicated he was very upset about his failed relationship with the victim. He displayed a knife, flicking it open and closed, while his mother watched. Archer told her that "[i]f he saw [the victim] with someone [else], he may use the knives on 'em' and that "he would probably kill them both." Archer also told his mother that he "didn't care about anything anymore because he had Hepatitis C." After speaking with his mother further, Archer left her house calmly.

[¶ 5] During the evening of April 26, the victim returned to the Bangor home of a married couple, with whom she was staying along with her new boyfriend. Archer arrived at the home close to the same time. Archer was quiet and asked to speak with the victim for a few minutes alone. The victim spoke with Archer quickly, then went upstairs to speak with her current boyfriend for approximately fifteen minutes. The victim next spoke with her friend, who encouraged the victim to speak with Archer outside just "to get it over with."

[¶ 6] The victim walked outside with Archer and her friend, but she had forgotten her purse, so she asked her friend to retrieve it for her, leaving the victim alone with Archer. Before the victim could speak with Archer, he grabbed her shoulder and pulled her towards him. The victim, at first, thought that Archer punched her twice; he had, however, stabbed her twice in the abdomen, which the victim only realized when she felt sharp pain and saw blood. The victim fell to the ground. Her friend came outside.

1. The jury also convicted Archer of aggravated assault (Class B), 17–A M.R.S. § 208(1)(B) (2010). Following Archer's motion to dismiss, the court merged the aggravated assault charge into the elevated aggravated assault charge and thus entered convictions and sentenced Archer for only attempted murder and elevated aggravated assault.

Archer saw her friend and ran away, leaving the victim bleeding on the ground.

[¶ 7] The victim's friend's husband, alerted by her friend's screams, picked up the victim and brought her inside the house; the victim then observed that she had bled all the way down "to [her] knees." The friend and her husband began applying pressure to the victim's wounds with a towel in order to stop the bleeding while waiting for the ambulance. After the ambulance arrived, the victim was transported to Eastern Maine Medical Center (EMMC).

[¶ 8] The attending surgeon at EMMC performed exploratory surgery on the victim to ascertain the path of the stabbing and the damage caused by the stabbing. Surgery revealed that there were two stab wounds—one two inches from the victim's heart and another that had lacerated the victim's liver. The laceration to the liver was a potentially life-threatening injury, as it placed the victim at risk for hemorrhage, shock, infection, and death. Following surgery, the victim remained in the hospital until April 30, when she was discharged. Her recovery lasted between six and eight weeks. The scarring from the stab wounds and the surgery are permanent.

[¶ 9] Archer was arrested for the elevated aggravated assault the following morning. On June 2, 2008, the Penobscot County Grand Jury indicted Archer for attempted murder, elevated aggravated assault, and aggravated assault. Archer initially pleaded not guilty to the indictment. Following Stage I and II examinations of Archer, *see* 15 M.R.S. § 101–B(1)(2) (2008),[2] Archer entered an additional plea of not criminally responsible because of mental disease or defect, pursuant to 17–A M.R.S. §§ 39, 40 (2010).

[¶ 10] The two-stage trial to first determine guilt and then, if guilt was found, determine criminal responsibility commenced on January 12, 2010. Early in the guilt phase of the trial, the State offered, and the court admitted into evidence without objection from Archer, a complete, certified copy of the medical records, including reports of the treating physicians, concerning the victim's treatment at EMMC. *See* 16 M.R.S. § 357 (2010); M.R. Evid. 803(4), (6).

[¶ 11] Later in the trial, Archer objected to testimony by the State's medical expert, who based his opinions on the reports of the victim's treating physician who did not testify at the trial. Those findings and conclusions were included in the previously-admitted medical records. The court overruled Archer's objection to this testimony.

[¶ 12] While incarcerated at the Penobscot County Jail, Archer had eleven separate telephone conversations with his mother that were recorded in accordance with jail practice. At trial, the State offered portions of three of those recorded conversations as admissions by Archer. *See* M.R. Evid. 801(d)(2). Archer argued that no portion of the recordings should be admitted unless the recordings of all eleven conversations were admitted and heard by the jury to provide a complete context for the conversations. *See* M.R. Evid. 106. The court allowed the State to present evidence regarding the portions of the three recordings it wanted to present, and Archer was able, during his cross-examination of the State's witness, to present evidence regarding the complete substance of the three recordings offered by the State.

---

**2.** Title 15 M.R.S. § 101–B(1)(2) (2008), which governed the mental examinations in this case, was repealed and replaced by 15 M.R.S. § 101–D(2) (2010), P.L.2009, ch. 268, § 3, which took effect following the examinations in this case.

The court refused to allow the jury to hear or receive evidence about the substance of the other eight conversations.

[¶ 13] The court also allowed, over Archer's remoteness objection, testimony by Archer's mother regarding his display of a knife and his threat to kill the victim that occurred at his mother's house a few hours before Archer's attack on the victim.

[¶ 14] The jury returned a verdict of guilty on the charges on January 19, 2010.

[¶ 15] On January 20, 2010, after hearing testimony and evaluating exhibits concerning Archer's criminal responsibility at the time of the crimes, the jury also found Archer criminally responsible for those crimes.[3]

[¶ 16] After a sentencing hearing on July 6, 2010, the court sentenced Archer to: (1) eighteen years' imprisonment for the attempted murder conviction, with all but thirteen years suspended; (2) thirteen years' imprisonment for the elevated aggravated assault conviction, to run concurrently with the imprisonment for the attempted murder; and (3) four years' probation with extensive conditions, including requirements that he submit to mental health evaluations and counseling and prohibitions from having contact with the victim and illegally using drugs.

[¶ 17] Archer appealed his convictions and his sentence. He later withdrew his sentence appeal.

## II. LEGAL ANALYSIS

### A. Testimony Regarding Medical Records

■ [¶ 18] Archer contends that the trial court erred when it allowed the State's medical expert to testify regarding the factual and medical conclusions of another physician that were included in the victim's medical records. The physician whose findings and conclusions were discussed did not testify, as she had moved from the area.

[¶ 19] Pursuant to M.R. Evid. 703, "an expert witness may rely upon the hearsay communications of other experts to establish the foundation for his or her opinion." *State v. Marques*, 2000 ME 43, ¶ 14, 747 A.2d 186, 190. However, "[a]n expert opinion does not become the vehicle to convey inadmissible hearsay evidence into the trial for direct consideration and analysis by the jury." Field & Murray, *Maine Evidence* § 703.2 at 399 (6th ed.2007).

[¶ 20] Though Archer timely objected to the State's expert's testimony, the court overruled the objection, noting that the State's expert was allowed to "explain what is already in the medical record that's already admitted into evidence." The court was correct. The witness was properly allowed to testify and be subject to cross-examination regarding statements in the medical records that already had been admitted without objection.

### B. Testimony Regarding Threat Stated to Mother

■ [¶ 21] Archer contends that the court erred when it allowed his mother to testify about threats he made regarding the victim hours prior to the attack. He asserts that this threat was too remote from the time of the crime and that the prejudicial effect of this testimony outweighed its probative value. M.R. Evid. 403.

■ [¶ 22] A trial court's decision regarding the effect of "remoteness" on the admissibility of evidence is reviewed for an abuse of discretion. *See State v. Ledger*, 444 A.2d 404, 414–15 (Me.1982).

---

3. No issue is raised on this appeal regarding the jury's criminal responsibility finding.

"Remoteness of evidence of threats or quarrels affects the weight rather than the competence of the evidence." *Id.* at 414 (citations omitted).

[¶ 23] *Ledger* addressed testimony regarding arguments between a victim and her killer that had occurred months prior to the victim's murder. *Id.* We deemed that evidence admissible, despite this time lag, concluding that the prejudicial effect of this testimony was "outweighed by its probative value." *Id.* at 415. Similarly, we have held in a variety of cases that evidence of threats made months before a violent crime is admissible. *See, e.g., State v. McEachern*, 431 A.2d 39, 43 (Me.1981) (testimony of threat made eighteen months before homicide admissible); *State v. Lewisohn*, 379 A.2d 1192, 1201 (Me.1977) (testimony of threats made within two months of homicide admissible); *State v. Doyon*, 221 A.2d 827, 829 (Me.1966) (testimony of threat made two months prior to assault admissible). "In criminal prosecutions antecedent menaces, quarrels and hostilities are admissible in proof of the malice or intention with which an act is done, and in a criminal action imposing a charge of assault, prior threats are admissible to show animus." *Doyon*, 221 A.2d at 829 (citations omitted).

[¶ 24] Here the threats against the victim and display of a knife occurred mere hours prior to the attack. The trial court acted well within its discretion when it permitted Archer's mother to testify concerning both the threats and the knife play. Because the State was required to prove intent as an element of the crimes, evidence of Archer's state of mind before his attack on the victim was both relevant and probative.

C. Exclusion of Recordings of Eight Separate Conversations

[¶ 25] Archer argues that the court abused its discretion when it de-clined to play for the jury the complete recordings of each of Archer's eleven phone calls to his mother from the Penobscot County Jail, after the State had played portions of three of the calls for the jury. Archer argues that the "rule of completeness" required the introduction of the balance of the audio recordings in order to "remov[e] the misleading effect of the fragment[s] already introduced."

[¶ 26] Because the jury learned of the complete contents of the three recorded phone calls, portions of which the State had offered in evidence, the real issue on this point on appeal is whether the rule of completeness, articulated through M.R. Evid. 106, can be extended beyond writings or recordings of individual statements to writings or recordings of separate statements made at different times. There is no dispute that the recordings of the eight telephone calls that the court excluded from evidence involved conversations separate and distinct from the three conversations that were presented to the jury.

[¶ 27] Pursuant to M.R. Evid. 106, when part of a statement is used by one party, the court may require that the rest of that statement, or any part of it, be admitted "if in fairness it ought to be considered." *State v. Dyer*, 2007 ME 118, ¶ 25, 930 A.2d 1040, 1045. "When the State utilizes a portion of a criminal defendant's statement to create an inculpatory impression, fairness demands that the defendant be afforded the opportunity to immediately place at least that portion in an exculpatory context." *State v. Woodward*, 617 A.2d 542, 544 (Me.1992).

[¶ 28] Here, there was no showing that any of the eight separate statements were a portion of a single integrated statement, as, for example, when a break is taken in the recording of a confession, with the

recording of the confession later resumed. Absent such a showing, the rule of completeness does not extend to allow a party to seek admission of separate statements made at separate times before or after the statement admitted into evidence in order to achieve completeness.

[¶ 29] The fact that a statement or a recording is part of evidence gathered by the State to support a prosecution does not change that rule. When the State does not offer a defendant's out-of-court statement or a portion thereof as an admission or confession pursuant to M.R. Evid. 801(d)(2), the defendant is not free to offer such statements as an exception to the hearsay rule. Out-of-court statements by a defendant in the record of a State investigation that a defendant wishes to offer in evidence are inadmissible hearsay unless subject to some exception to the hearsay rule specified in M.R. Evid. 803 or 804. *See United States v. McDaniel,* 398 F.3d 540, 545–46 (6th Cir.2005) (effort by criminal defendant to introduce into evidence his statement to investigating officer properly refused as inadmissible hearsay); *United States v. Waters,* 194 F.3d 926, 931 (8th Cir.1999) (defendant's statements to investigator, offered by defendant, are "inadmissible hearsay except in narrow circumstances not present" in that case); *see*

*also United States v. Ortega,* 203 F.3d 675, 682 (9th Cir.2000); *United States v. Chard,* 115 F.3d 631, 635 (8th Cir.1997). As the Sixth Circuit observed:

> Rule 801(d)(2), however, does not extend to a party's attempt to introduce his or her *own* statements through the testimony of other witnesses. Indeed, if such statements were deemed admissible under Rule 801(d)(2), parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury.

*McDaniel,* 398 F.3d at 545 (citations omitted, emphasis in original).

[¶ 30] Thus, the court did not err in excluding evidence that would have disclosed the contents of the eight separate conversations to the jury.

The entry is:

Judgments affirmed.