STATE OF MAINE
CUMBERLAND, SS.

BUSINESS AND CONSUMER COURT
LOCATION: PORTLAND
Docket No. BCD-CV-15-65 ✓

SPIRO BASHA,        )
             )
    Plaintiff,       )
             )   ORDER ON DEFENDANT'S MOTION
  v.            )   FOR SUMMARY JUDGMENT
             )
CINCINNATI INCORPORATED,    )
             )
    Defendant.      )

Defendant Cincinnati Incorporated has moved for summary judgment on all counts brought against it by Plaintiff Spiro Basha. For the following reasons, Defendant's motion is granted in part and denied in part.

## BACKGROUND[1]

Defendant is an Ohio corporation that manufactures powder metal press machines. Nichols Portland ("Nichols") purchased a two-platen 66 DC Fast Set-Up Press from Defendant in 1988 (hereafter, the "Press"). (Def. Supp'g S.M.F. ¶ 1; Pl. Opp. S.M.F. ¶ 1.) Nichols uses the Press to manufacture metal parts from alloys of powder metal. The Press includes a movable "die set" that is manually moved into position within the Press frame prior to a production run. Each die set weighs approximately 2000-2500 pounds. The Press was initially equipped with a top and bottom platen and a fill adjustment shaft for each platen. (Def. Supp'g S.M.F. ¶¶ 2, 33; Pl. Opp. S.M.F. ¶ 33.) Nichols removed the bottom platen and fill adjustment shaft in 1991. (Pl. Add'l S.M.F. ¶ 7; Def. Reply to Pl. Add'l S.M.F. ¶ 7.) The Press was also equipped with air

---

[1] Unless otherwise noted, the following background information is taken from Plaintiff's complaint, Defendant's answer, and the parties' memorandums in support of and opposition to summary judgment. This background information is provided only for context and is not a finding of fact.

suspension technology for moving the die set in and out of the Press. (Def. Supp'g S.M.F. ¶ 28.) Defendant asserts that the air suspension technology required only a single operator to move the die set during set-up and did not require the operator to encounter the interior of the Press. (*Id.* ¶¶ 3-5, 7.) In 2001 or 2002, Nichols relocated the Press and instituted a two-person set-up process for moving the die set into the Press. (Def. Supp'g S.M.F. ¶¶ 9-10; Pl. Opp. S.M.F. ¶ 9.) Nichols's two-person set-up process required one operator to push the die set from the rear, while a second operator pulled the die set into position from the front while walking backwards through the Press frame. (*Id.* ¶ 12.)

Plaintiff was an employee of Nichols. Plaintiff was hired in 1999 and became an operator of the Press in 2004. On October 20, 2009, Plaintiff and a co-worker, Steven Rapp, were moving the die set into the Press for a production run. Rapp was pushing the die set from behind while Plaintiff was pulling the die set into the Press frame from the front. Plaintiff positioned his hands on the guide posts on each side of the die set. Plaintiff's hands were caught in a pinch point between the guide posts of the die set and the bulbous assembly of the ejector rods on the Press frame. Rapp was able to free Plaintiff's hands by using a winch to remove the die set.

Plaintiff filed a complaint for products liability and breach of implied warranties against Defendant on September 8, 2015. This case was transferred to the Business and Consumer Court on October 20, 2015. Defendant filed a motion for summary judgment on all counts on December 2, 2016. Following an extension of time, Plaintiff filed his opposition to summary judgment on February 22, 2017. Following an extension of time, Defendant filed its reply on March 22, 2017. Oral argument was held on April 18, 2017.

2

## STANDARDS OF REVIEW

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. A fact is material if it can affect the outcome of the case. *Dyer*, 2008 ME 106, ¶ 14, 951 A.2d 821. A genuine issue of material fact exists if the fact finder must choose between competing versions of the truth. *Id.* When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

If the moving party's motion for summary judgment is properly supported, the burden shifts to the non-moving party to respond with specific facts establishing a prima facie case for each element of the claim challenged by the moving party. M.R. Civ. P. 56(e); *Chartier v. Farm Family Life Ins. Co.*, 2015 ME 29, ¶ 6, 113 A.3d 234. If the non-moving party fails to present sufficient evidence of the challenged elements, then the moving is entitled to a summary judgment. *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897. Even if one party's version of the facts appears more credible and persuasive, any genuine issue of material fact must be resolved by the fact finder, regardless of the likelihood of success. *Estate of Lewis v. Concord Gen. Mut. Ins. Co.*, 2014 ME 34, ¶ 10, 87 A.3d 732.

## APPLICABLE LAW

Plaintiff has brought products liability claims against Defendant based on strict liability (Count I), negligence (Count II), design defect (Count III), and failure to warn (Count IV).

Under Maine's product liability statute, a seller is strictly liable if: (1) the defendant sold the goods or products; (2) the goods or products were in a defective condition unreasonably dangerous to users, consumers, or their property; (3) the plaintiff might reasonably be expected

3

to use, consume, or be affected by the goods or products; (4) defendant was engaged in the business of selling the goods or products; (5); the goods or products were expected to, and, in fact, did reach the user or consumer "without significant change in the condition in which they were sold;" and (6) the plaintiff or their property suffered physical harm. 14 M.R.S. § 221; *Burns v. Architectural Doors & Windows*, 2011 ME 61, ¶ 23 n.7, 19 A.3d 823.

A product may be defective in three ways: (1) an error in manufacturing; (2) an error in design; or (3) failure to warn of a product hazard. *Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 537 n.3 (Me. 1986). In this case, Plaintiff alleges that the Press was defective in all three ways.

With regard to failure to warn, a product, although faultlessly made, may be deemed defective "if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning and the product is supplied and no warning is given." *Lorfano v. Dura Stone Steps, Inc.*, 569 A.2d 195, 196 (Me. 1990). To establish a claim that a product was defective for a failure to warn, the plaintiff must prove three elements in addition to those in the strict liability statute: "(1) the defendant had a duty to warn the plaintiff of the product hazard; (2) any actual warning on the product was inadequate; and (3) the inadequate warning or absence of a warning proximately caused the plaintiff's injury." *Burns*, 2011 ME 61, ¶ 23, 19 A.3d 823. A seller has a duty to inform users and consumers of dangers that the seller "either knows or should have know about at the time the product is sold." *Lorfano*, 569 A.2d at 197. A seller has no duty to warn of a danger that is "obvious and apparent." *Id.*

"Products liability sounds in negligence when by its design, manufacture, or failure to warn, the defendant breaches a duty owed to the plaintiff, and such breach was the actual and legal cause of the plaintiff's injuries." *Pottle v. Up-Right, Inc.*, 628 A.2d 672, 675 (Me. 1993).

4

Strict liability failure-to-warn cases often resemble negligence actions because the reasonableness of the seller's conduct is the critical element. *Bernier*, 516 A.2d at 540. No such parallel exists between strict liability design defect claims and negligence claims. *Burns*, 2011 ME 61, ¶ 20 n.3, 19 A.3d 823. However, "[i]n actions based upon defects in design, negligence and strict liability theories overlap in that under both theories the plaintiff must prove that the product was defectively designed thereby exposing the user to an unreasonable risk of harm." *Stanley v. Schiavi Mobile Homes, Inc.*, 462 A.2d 1144, 1148 (Me. 1983). Moreover, "[i]n order to recover under either a product liability or a negligence theory, it is essential that the plaintiff prove that a product's defective design or the defendant's negligent conduct proximately caused the plaintiff's injuries." *Ames v. Dipietro-Kay Corp.*, 617 A.2d 559, 561 (Me. 1992).

Plaintiff in this case has also brought a claim for breach of implied warranties of merchantability and fitness for a particular purpose (Count V). In every contract for a sale of goods, there is an implied warranty that the product sold is merchantable. 11 M.R.S. § 2-314(1). To be deemed merchantable, a product must, *inter alia*, be "fit for the ordinary purposes for which such goods are used." 11 M.R.S. § 2-314(2)(c). To establish breach, the plaintiff must prove that a product, because of its defects, either did not work properly or was unexpectedly harmful. *Lorfano*, 569 A.2d at 197.

To establish breach of an implied warranty of fitness for a particular purpose, a plaintiff must prove: (1) the buyer had a particular purpose for the goods outside the scope of ordinary purposes; (2) the seller, at the time of contracting, has reason to know of the buyer's particular purpose; (3) the seller also has reason to know that the buyer would rely on the seller's skill or judgment to furnish appropriate goods; and (4) the buyer, in fact, relied on the seller's skill or judgment. *Lorfano*, 569 A.2d at 197; 11 M.R.S. § 2-315.

5

Defendant asserts it is entitled to summary judgment on six grounds: (1) Plaintiff's injuries were the result of a Nichols's modification to the Press; (2) the modifications were not foreseeable to Defendant at the time the Press was sold; (3) there was no duty to warn Plaintiff because the danger was obvious and apparent; (4) as a result of the modification, Plaintiff cannot establish proximate cause; (5) Plaintiff cannot establish a breach of warranty; and (6) Plaintiff cannot establish that the accident was the medical cause of his ulnar impaction or carpal tunnel syndrome. (Def. Mot. Summ. J. 7-15.)

## I. Whether the Press was sold with a Manufacturing or Design Defect

In order to hold a seller liable, the product must be sold in a defective condition. 14 M.R.S. § 221; *Burns*, 2011 ME 61, ¶ 23 n.7, 19 A.3d 823. As previously discussed, a product may be defective in three ways: (1) an error in manufacturing; (2) an error in design; or (3) failure to warn of a product hazard. *Bernier*, 516 A.2d at 537 n.3. Throughout its first two arguments, Defendant contends that the Press was designed, manufactured, shipped, received, and initially used by Nichols without defects and that the Press only became unsafe as a result of significant modifications by Nichols. (Def. Mot. Summ. J. 7-10.) According to Defendant, the Press was equipped with a bottom platen and fill adjustment shaft when it was delivered to Nichols in 1988. (Def. Supp'g S.M.F. ¶¶ 1-2.) Plaintiff's own liability expert, Jack Krafchick, conceded that the pinch point where Plaintiff was injured "was not accessible" and the Press was safe when it was manufactured, shipped, received, and put into use by Nichols.[2] (*Id.* ¶ 6;

---

[2] Plaintiff objects to Mr. Krafchick's testimony, stating that Mr. Krafchick never saw the Press as it was delivered in 1988, and therefore, had no personal knowledge whether the Press was safe. (Pl. Opp. S.M.F. ¶ 6.) Unlike lay witnesses, an expert's opinion need not be based solely on personal knowledge. An expert may base an opinion on any facts or data in the case that the expert has been made aware of. M.R. Evid. 703.

Krafchick Dep. 67:13-18.) Both Nichols and Plaintiff's expert agree that the Press became unsafe only after Nichols removed the bottom platen and fill adjustment shaft, allowing an operator to walk backwards through the Press frame. (*Id.* ¶¶ 13-14.)

In opposition, Plaintiff asserts that the pinch point was accessible regardless of whether the bottom platen and fill adjustment shaft were present. (Pl. Opp'n to Def. Mot. Summ. J. 7.) Plaintiff cites deposition testimony from Nichols's employee Steven Rapp to support his assertion. (Pl. Opp. S.M.F. ¶¶ 7, 13-14; Pl. Add'l S.M.F. ¶¶ 15-16.) According to Plaintiff, Rapp testified that a single operator could access the interior of the Press and encounter the pinch point hazard regardless of whether the bottom platen and fill adjustment shaft were removed. (*Id.*) However, the cited testimony does not support Plaintiff's contentions. Although Rapp did testify that he some times had to reach into the Press from the front when installing the die set using the one-person, it is clear Rapp was describing the set-up process after the bottom platen and fill adjustment shaft had already been removed by Nichols. (Rapp. Dep. 78:3-79:13.) Rapp testified that he began working at Nichols in March 1997 and that there was no bottom platen fill adjustment shaft present when he began operating the Press. (*Id.* at 6:5-6, 7:12-9:3.) There is no dispute that Nichols removed the bottom platen in 1991. (Pl. Add'l S.M.F. ¶ 7; Def. Reply to Pl. Add'l S.M.F. ¶ 7.) Rapp's other testimony cited by Plaintiff does not address the pinch point hazard at issue in this case. Rapp testified that, in order to remove the die set from the Press, he had to bend down and reach into the bottom of the Press to unlock latches in the front and back of the Press. (Rapp Dep. 80:4-82:5.) This testimony is irrelevant to whether pinch point hazard was accessible to an operator when the Press was manufactured, shipped, received, and put into use by Nichols.

Plaintiff also asserts that, according to Krafchick's expert report, "a pinch point hazard *was* present on the Press," that the hazard could have been identified and/or eliminated, and the priority elements of the safety hierarchy were both technically and economically feasible when the Press was manufactured in 1988. (Pl. Add'l S.M.F. ¶¶ 25-26) (emphasis supplied); *see also* (Pl. Opp. S.M.F. ¶ 25.) However, Plaintiff mischaracterizes Krafchick's expert report. Krafchick's report does not state that there "was" a pinch point hazard on the Press in the past tense. Krafchick's May 3, 2015 expert reports states, "a pinch point *is present* on the subject Cincinnati press during set-up operations." (Pl. Ex. 11) (emphasis supplied). Krafchick's expert report is clearly stating that a pinch point *is currently present* on the Press with the bottom platen and fill adjustment shaft removed. Krafchick's expert report does not address whether the pinch point hazard was accessible and whether the Press was safe when it was manufactured, shipped, received, and put into use by Nichols in 1988.

Based on the record before the court, there is no genuine dispute of material fact that the pinch point where Plaintiff was injured "was not accessible" and that the Press was safe when it was designed, manufactured, shipped, received, and initially used by Nichols. Thus, there is no genuine dispute that, absent any modifications, the Press was designed and manufactured without a defect. Defendant is entitled to summary judgment on Plaintiff's claims based on either design of manufacturing defect. Plaintiff's theory of liability may rest only a failure to warn the user of a danger in the use of the product. *See Rumery v. Garlock Sealing Techs., Inc.*, 2009 Me. Super. LEXIS 73, at *12 (Apr. 24, 2009) (citing *Lorfano*, 569 A.2d at 196).

## II. Whether Nichols's Modification to the Press was a Significant and Unforeseeable Change.

Defendant contends that the Press only became unsafe as a result of significant modifications by Nichols, and that those modifications were not foreseeable by Defendant when

8

the Press was manufactured and sold. (Def. Mot. Summ. J. at 7-10.) Generally, in order to hold a seller liable, the product must reach the user "without significant change in the condition in which they were sold." 14 M.R.S. § 221; *Burns*, 2011 ME 61, ¶ 23 n.7, 19 A.3d 823. A change is significant if it "relates to the essential features and to the safety of the product." *Marois v. Paper Converting Mach. Co.*, 539 A.2d 621, 624 (Me. 1988). However, a seller may still be liable if a change to the product was or should have been foreseen and the change contributed to, enhanced, or increased the likelihood of the plaintiff's injury. *Id.* A seller will only be relieved of liability if the change was both unforeseeable and an intervening proximate cause of the injury. *Id.*

Defendant contends that Nichols modified the Press when it removed the bottom platen and fill adjustment shaft in 1991. (Def. Supp'g S.M.F. ¶ 11; Pl. Add'l S.M.F. ¶ 7.) As discussed above, the Press was originally manufactured and delivered with two platens. (Def. Supp'g S.M.F. ¶ 1.) The Press was equipped a fill adjustment shaft for each platen. (*Id.* ¶ 33.) Defendant asserts the bottom platen fill adjustment shaft was permanent fixture to the Press. (*Id.* ¶ 2.) As a result of the removal of the bottom platen and fill adjustment shaft, an operator now had access to the interior of the Press. (*Id.* ¶ 11.) According to both Nichols and Plaintiff's expert Krafchick, Nichols's removal of the bottom platen and fill adjustment shaft, along with the institution of the two-person set-up process, rendered the previously safe set-up process unsafe. (*Id.* ¶¶ 13-14.) Without the removal of the bottom platen and fill adjustment shaft and the change to a two-person set-up process, Plaintiff could not have encountered the pinch point hazard inside the Press frame. (*Id.* ¶ 18.) Defendant contends it has never sold a 66 DC Fast Set-Up press with only one platen; that, prior to 1988, all of the DC presses it had manufactured and shipped were either two-platen or three-platen presses; and it had no knowledge of a buyer

9

ever changing a two-platen press to a one-platen press by removing the bottom platen and fill adjustment shaft. (*Id.* ¶¶ 21, 23, 27, 31.) Defendant further contends that it was unaware of any other instances of an operator being injured by a 66 DC Fast Set-Up press and that it was unaware of any other person being injured by a pinch point while installing a die set or walking backward inside any model of powder metal press. (*Id.* ¶¶ 19-20.)

In opposition, Plaintiff asserts that Nichols's modification was not a "significant change" because the bottom platen and fill adjustment shaft was an optional feature and that Nichols modified the Press in an intended and foreseeable manner. (Pl. Opp'n Mot. Summ. J. 6-10.) Plaintiff cites Defendant's marketing materials, which show that Defendant offered the 66 Fast Set-Up DC press equipped with one, two, or three platens. (Pl. Add'l S.M.F. ¶ 4; Pl. Opp. S.M.F. ¶¶ 11, 27, 31; Pl. Exs. A, 3.) Defendant's marketing material also state that the Press is "designed to accept a three platen die module" and "will also accept single or two platen modules," that the Press "is designed for any die module combination," and that "[t]his permits you to select the modules you need now; and as future production requirements change, [the Press] will continue to meet your needs." (Pl. Add'l S.M.F.¶ 6; Pl. Opp. S.M.F. ¶¶ 2, 11; Pl. Exs. A, 3.) Plaintiff also cites the Operation and Maintenance Manual for the Press, which states that the middle and bottom platen fill adjustment shafts on the Press are "Optional."[3] (Pl. Add'l

---

[3] Defendant objects to the court's consideration of the marketing materials and the Operation and Maintenance Manual on the grounds that both documents constitute inadmissible hearsay. (Def. Reply to Pl. Add'l S.M.F. ¶¶ 4-6; Def. Reply to Pl. Opp. S.M.F. ¶¶ 2, 11, 27, 31.) Contrary to Defendant's assertions, the marketing materials and the Operation and Maintenance Manual are likely non-hearsay because they are either (1) being offered for purposes other than the truth of the matter asserted or (2) a statement by an opposing party. M.R. Evid. 801(c), (d)(2). Defendant has not objected to the marketing materials and the Operation and Maintenance Manual on the grounds that they lack foundation or proper authentication. (Def. Reply to Pl. Add'l S.M.F. ¶¶ 4-6; Def. Reply to Pl. Opp. S.M.F. ¶¶ 2, 11, 27, 31.) Therefore, the cited documents appear to be of a quality admissible at trial and may be considered on summary judgment. *See Beneficial Me. Inc. v. Carter*, 2011 ME 77, ¶ 10, 25 A.3d 96.

10

S.M.F. ¶ 5; Pl. Exs. A, 3.) There is no dispute that Nichols never used the bottom platen of the Press before removing the bottom platen and fill adjustment shaft in 1991. (Pl. Add'l S.M.F. ¶ 7; Def. Reply to Pl. Add'l S.M.F. ¶ 7.) According to Plaintiff's expert Krafchick, it is common for manufacturers like Nichols to purchase equipment with features that are not necessarily needed at the time of purchase. (Pl. Add'l S.M.F. ¶ 24.)

Based on the foregoing, there is a genuine issue material fact whether the bottom platen and fill adjustment shaft were a permanent or optional feature of the Press. Thus, there is a genuine issue material fact whether Nichols's removal of the bottom platen and fill adjustment shaft was a significant change to an essential feature and whether the change was unforeseeable. Therefore, Defendant is not entitled to summary judgment based on those issues.

**III.    Whether Nichols's use of a Two-Person Set-up Process was a Foreseeable Misuse**

Defendant asserts that Nichols made a second "modification" to the Press when it instituted a two-person set-up process for installing the die set in 2001 or 2002. (Def. Supp'g S.M.F. ¶¶ 9-10.) Defendant contends that Nichols's change to a two-person set-up process was a significant and foreseeable change in an essential feature of the Press relieving it of liability for Plaintiff's injury. (Def. Mot. Summ. J. 7-10.)

However, Nichols's change to a two-person set-up process is not a substantial change to an "essential feature" of the Press. *See Marois*, 539 A.2d at 624. Rather, it is a change in the use of the product. *See* 63 Am. Jur. 2d Products Liability § 19 ("the product is expected to and does reach the user or consumer without substantial change *in the condition* in which it is sold." (emphasis supplied)); 63 Am. Jur. 2d Products Liability § 596 ("*misuse or improper use, rather than the condition of the product itself*, may be found responsible for the plaintiff's injuries or damages." (emphasis supplied)). Although a change in use of a product is not a substantial

11

change in the condition of the product, misuse or improper use of a product may still relieve the defendant of liability if the misuse or improper was unforeseeable and constitutes an intervening proximate cause. 63 Am. Jur. 2d Products Liability § 596; *see also* Simmons, Zillman, & Gregory, *Maine Tort Law* § 12.15 at 12-23 (2004 ed.) ("The harm to the plaintiff from a defective product must have resulted while the product was being used in a reasonably foreseeable manner. This includes use for normal purposes and reasonably foreseeable misuses.")

Defendant contends that Nichols's change to the two-person set-up process, in which a second operator would walk backward through the Press, exposing the second operator to a previously unexposed hazard, was unforeseeable to Defendant. (Def. Mot. Summ. J. 7-10.) Defendant asserts the Press was manufactured with air suspension technology for moving the die set in and out of the Press. (Def. Supp'g S.M.F. ¶ 28.) The air suspension technology requires only one operator to move the die set during set-up and does not require a rigging crew. (*Id.* ¶¶ 3-5.) The one-person set-up process did not require an operator to encounter the interior of the Press. (*Id.* ¶ 7.) Nichols's deponent testified that the air suspension technology was a primary reason to buy the 66 DC Fast Set-Up press. (*Id.* ¶ 29.) For presses without air suspension technology, the die set was commonly moved using a forklift, hand truck, or other mechanized device. (*Id.* ¶ 28.) In 2001 or 2002, Nichols relocated the Press and instituted a two-person set-up process, which required one operator to push the die set from the rear, while a second operator pulled the die set into position from the front while walking backwards through the Press frame. (*Id.* ¶¶ 9-10, 12.) Defendant avers that it was unaware of Nichols's two-person set-up process and that it was unaware of any instances of a person being injured while moving a die set or walking backward inside any model of powder metal press. (*Id.* ¶¶ 19-20, 22.) Both

12

Nichols and Plaintiff's expert agree that the Press became unsafe only after Nichols removed the bottom platen fill adjustment shaft and instituted the two-person set-up process. (*Id.* ¶¶ 13-14.) Plaintiff's expert concedes that, without the removal of the bottom platen fill adjustment shaft and the change to a two-person set-up process, Plaintiff could not have encountered the pinch point hazard inside the Press frame. (*Id.* ¶ 18.)

In opposition, Plaintiff asserts that Defendant never provided detailed written instructions on how to install the die set. (Pl. Add'l S.M.F. ¶ 9.) Plaintiff cites the Operation and Maintenance Manual for the Press, which simply instructs the operator to "Install die set in press frame." (*Id.*; Pl. Ex. 3.) Plaintiff further asserts that the Operation and Maintenance Manual never expressly precluded a two-person set-up process for die set installation. (Pl. Add'l S.M.F. ¶ 10; Pl. Opp. S.M.F. ¶¶ 3, 10, 12.) Plaintiff cites testimony from Nichols employees Rapp and Sean Cormier that Press operators frequently encountered difficulties moving the die set into position, thereby requiring additional help to maneuver the die set in and out of the Press.[4] (Pl. Add'l S.M.F. ¶ 42; Pl. Opp. S.M.F. ¶¶ 4-5, 10.) Plaintiff also asserts that the change to the two-person set-up process was the result of a "Kaizen" review and that the change to a two-person

---

[4] Rapp and Cormier disagree on what the caused the difficultly when installing the die set. Rapp testified that a gap between the floor plate and the Press created an "air gap" causing the air suspension technology to fail and the die set to jam. (Rapp Dep. 14:5-15:16.) Cormier testified that the accumulation of powder metal made the floor surface uneven, rendering the air suspension technology ineffective and causing the die set to jam. (Cormier Dep. 12:12-15:22.)

Throughout its reply, Defendant contends for the first time that the "air gap" that allegedly caused the die set to become jammed was caused by Nichols's "repositioning" of a floor plate. *See e.g.* (Def. Reply to Pl. Add'l S.M.F. ¶ 42.) Defendant asserts that this "modification" caused Nichols to institute the two-person set-up process, placing the second operator in harm's way. (*Id.*) Defendant does not expressly argue that the "repositioning" of the floor plate was itself a significant change to an essential feature of the Press, thus relieving Defendant of liability. (*Id.*) Defendant does not state, and it is not clear from the cited record, whether the floor plate was a part of or separate from the Press itself. (*Id.*) Defendant continues to argue that the removal of bottom platen fill adjustment shaft and the mere institution of the two-person set-up process were the significant changes to the Press that relieve it of liability.

13

set-up process was actually a safety improvement. (Pl. Add'l S.M.F. ¶¶ 12-13; Pl. Opp. S.M.F. ¶ 13.) Plaintiff cites testimony from Rodrigo Villareal that the two-person set-up process was safer because "it gives you the ability to have another... set of eyes in the process because you're working as a team." (Villareal Dep. 15:12-17.)

Based on the foregoing, there is sufficient evidence demonstrating a genuine issue of material fact whether Nichols's use of a two-person set-up process was an unforeseeable misuse of the Press. Therefore, Defendant is not entitled to summary judgment on that issue.

## IV.  Whether the Pinch Point Hazard was Obvious and Apparent

As previously discussed, although a seller has a duty to warn users of a known danger, a seller has no duty to warn of a danger that is "obvious and apparent." *Lorfano*, 569 A.2d at 197. Defendant asserts the pinch point hazard was obvious and apparent as a matter of law. (Def. Mot. Summ. J. 13; Def.) Defendant cites testimony from several witnesses to support its contention. (Def. Supp'g S.M.F. ¶¶ 15-17.) Nichols's deponent testified that the pinch point between the ejection rods and the guide posts was obvious for anyone to see and that it "would be apparent that it would be difficult to – to move any object through there with your hand in that position." (Scott Dep. 49:9-11, 51:7-9.) Nichols employee Rapp agreed that the pinch point was obvious during the process of loading and unloading the die set. (Rapp Dep. 37:17-25.) Nichols employee Kevin Waterman testified at deposition that the small gap on each side of the die set between the front guide posts of the die set and the ejector rods was visible and open and obvious to an operator. (Waterman Dep. 33:21-34:5.) Nichols employee Cormier also testified that he knew there was a small gap between the ejector rods and the guide posts. (Cormier Dep. 37:20-38:3.) In his May 3, 2015 expert report, Krafchick noted:

> Mr. Basha advised that over the years he maneuvered die carts into position many times. On these prior occasions he would relocate his hands to a lower position

14

when passing through the frames. He did this so as not to encounter the pinch point hazard created by the tight clearance between the bulbous assembly and the base of the ejector rod and the adjacent die post. However, on the occasion of his accident he did not relocate his hands.

(Def. Ex. I.) At deposition, Krafchick stated that Plaintiff told him that he knew about the pinch point hazard. (Krafchick Dep. 60:3-7.) Krafchick agreed that, because Plaintiff knew about the pinch point, the hazard was "open and obvious." (*Id.* at 60:8-11.) Rapp testified that after the accident, Plaintiff told him, "I accidentally put my hands in the wrong place." (Rapp Dep. 62:10-13.) Rapp testified that Plaintiff also told him, "he wasn't thinking right at the right time" when the accident occurred. (*Id.* at 62:18-23.)

In opposition, Plaintiff cites his deposition testimony that he was unaware of the pinch point hazard at the time of his injury. (Pl. Add'l S.M.F. ¶ 40; Pl. Opp. S.M.F. ¶¶ 15-16; Basha Dep. 62:24-63:9, 68:12-20.) Plaintiff asserts that the pinch point was not obvious and apparent to others operators of the Press and that the operators did not fully appreciate that danger of the pinch point. (Pl. Add'l S.M.F. ¶ 41; Pl. Opp. S.M.F. ¶ 15.) Plaintiff cites Waterman's testimony that, although the small gap on each side was open and obvious, he was not aware of the gap while maneuvering the die set because he was focused on other potential hazards. (*Id.*; Waterman Dep. 34:6-35:25.) Plaintiff also cites Cormier's testimony that, although he knew there was a small gap between the ejector rods and the guide posts, he was not fully aware of the pinch point hazard.[5] (Pl. Opp. S.M.F. ¶ 15; Cormier Dep. 38:4-19.)

---

[5] Plaintiff also asserts that, during the "Kaizen" review, no one identified an open and obvious pinch point hazard where Plaintiff was injured. (Pl. Add'l S.M.F. ¶ 14.) However, the cited testimony does not support Plaintiff's contention. (Villareal Dep. 18:4-15.)
Plaintiff also avers that Defendant now sells a sticker warning operators of the pinch points on the Press and Nichols has installed a grasping device on the die set, allowing an operator to maneuver the die set into the Press without exposure to the pinch point hazard. (Pl. Add'l S.M.F. ¶¶ 21-22.) Plaintiff cites these remedial measures as evidence that the pinch point hazard was previously not obvious and apparent. (Pl. Opp'n to Def. Mot. Summ. J. 11.) Defendant objects

15

Based on the foregoing, there is sufficient evidence demonstrating a genuine issue of material fact regarding whether the pinch point hazard was obvious and apparent. Therefore, Defendant is not entitled to summary judgment on that issue.

## V. Proximate Causation

In order to sustain products liability claims for both a failure to warn and negligence, the plaintiff must produce evidence that defendant's failure to give an adequate warning proximately caused the plaintiff's injuries. *Burns*, 2011 ME 61, ¶ 23, 19 A.3d 823; *Pottle*, 628 A.2d at 675. "Proximate cause is that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred." *McIlroy v. Gibson's Apple Orchard*, 2012 ME 59, ¶ 8, 43 A.3d 948 (citation omitted). As discussed above, a significant and unforeseeable change in the condition of the product will relieve the defendant of liability if it constitutes an intervening proximate cause. *Marois*, 539 A.2d at 624. Misuse or improper use of a product will also relieve the defendant of liability if the use was unforeseeable and constitutes an intervening proximate cause. 63 Am. Jur. 2d Products Liability § 596.

Defendant contends that the Press was safe when it left Defendant and was first used by Nichols and that a warning about the pinch point would have made no difference because the pinch point was not accessible. (Def. Mot. Summ. J. 13.) Defendant contends it was Nichols's

---

to the court's consideration of this evidence, asserting the evidence is inadmissible under Maine Rule of Evidence 407. (Def. Reply to Pl. Add'l S.M.F. ¶¶ 21-22.) Rule 407 provides that subsequent remedial measures are inadmissible to prove the existence of a defect in a product or its design or the need for a warning or instruction. M.R. Evid. 407(a)(3)-(4). However, the court may admit such evidence for another purpose. M.R. Evid. 407(a). Therefore, although Defendant's and Nichols's remedial measures are not admissible to prove liability, they *may* be admissible at trial as evidence of whether the pinch point hazard was obvious and apparent. However, because there is sufficient other evidence demonstrating a genuine material fact regarding this issue, the court need not decide at this time whether such evidence would be admissible.

removal of the bottom platen fill adjustment shaft and its change to the two-person set-up process that proximately caused Plaintiff's injuries. (*Id.* at 13-14.) As discussed above, there is no genuine dispute the Press was safe when it was designed, manufactured, shipped, received, and initially used by Nichols because the pinch point hazard was not accessible to operators. Nichols removed the bottom platen and fill adjustment shaft from the Press in 1991. (Def. Supp'g S.M.F. ¶ 11; Pl. Add'l S.M.F. ¶ 7.) Defendant asserts the Press was manufactured with air suspension technology, which required only one operator to move the die set and did not require an operator to encounter the interior of the Press during set-up. (Def. Supp'g S.M.F. ¶¶ 3-4, 7, 28.) In 2001 or 2002, Nichols relocated the Press and instituted a two-person set-up process, which required a second operator to pull the die set into position from the front while walking backwards through the Press frame. (*Id.* ¶¶ 10, 12.) Both Nichols and Plaintiff's expert agree that the Press became unsafe only after Nichols removed the bottom platen and fill adjustment shaft and instituted the two-person setup process. (*Id.* ¶¶ 13-14.) Plaintiff's expert concedes that, without the removal of the bottom platen and fill adjustment shaft and the change to a two-person set-up process, Plaintiff could not have encountered the pinch point hazard inside the Press frame. (*Id.* ¶ 18.)

Defendant also contends that there is no evidence a warning would have prevented Plaintiff's injuries in order to establish proximate cause. (Def. Mot. Summ. J. 14.) Defendant cites Plaintiff's statements to Krafchick that he maneuvered die carts into position many times, that he would relocate his hands to avoid the pinch point hazard, and that on the occasion of his accident he did not relocate his hands. (Def. Supp'g S.M.F. ¶ 16.) Defendant also cites Plaintiff's statement to Rapp that "he wasn't thinking right" when the accident occurred. (*Id.* ¶ 17.)

17

As discussed above, Plaintiff asserts that bottom platen and fill adjustment shaft were an "optional" feature of the Press, which a purchaser might foreseeably remove. (Pl. Add'l S.M.F. ¶¶ 4-6.) Plaintiff's expert avers that it is common for manufacturers like Nichols to purchase equipment with features that are not needed at the time of purchase. (*Id.* ¶ 24.) Plaintiff further asserts that Defendant never provided detailed written instructions on how to install the die set, other than simply "Install die set in press frame." (Pl. Add'l S.M.F. ¶ 9; Pl. Ex. 3.) Plaintiff asserts that the Operation and Maintenance Manual never expressly precluded a two-person set-up process for die set installation. (Pl. Add'l S.M.F. ¶ 10; Pl. Opp. S.M.F. ¶¶ 3, 10, 12.) It is undisputed that there were no warnings of the pinch point hazard when the Press was delivered in 1988 or on October 20, 2009, when Plaintiff was injured. (Pl. Add'l S.M.F. ¶¶ 17-18; Def. Reply to Pl. Add'l S.M.F. ¶¶ 17-18.) Plaintiff testified at deposition that he was unaware of the pinch point hazard. (Add'l S.M.F. ¶ 40.) Although Nichols's deponent and several employees conceded that the pinch point was visible and Plaintiff told Rapp he put his hands in the wrong place, Plaintiff assert the operators did not fully appreciate the danger of the pinch point hazard. (*Id.* ¶ 41.) Plaintiff's expert Karfchick's testified that a "warning is there to reinforce what [users] may already know, but without the warning, [users] sometimes are forgetful." (*Id.* ¶ 19; Krafchick Dep. 70:16-20.) Krafchick also testified that "black and yellow stripping" on the die post and ejector rod nut indicating the pinch point hazard would have prevented this injury. (*Id.* ¶ 20.)

Based on the foregoing, there is sufficient evidence demonstrating there are genuine issues of material fact for trial. First, there are genuine issues of material fact whether a lack of adequate warning proximately caused Plaintiff's injuries. Second, there are also genuine issues of material fact whether the removal bottom platen fill adjustment shaft and change to the two-

18

person set-up process were intervening proximate causes. Therefore, Defendant is not entitled to summary judgment on that issue.

## VI.    Breach of Implied Warranties

Defendant contends that Plaintiff cannot establish a breach of the implied warranties of merchantability or fitness for a particular purpose. (Def. Mot. Summ. J. 14-15.) As discussed above, a product must be "fit for the ordinary purposes for which such goods are used" in order to be deemed merchantable. 11 M.R.S. § 2-314(2)(c). To sustain a claim for breach of the implied warranty of merchantability, the plaintiff must demonstrate that a product, because of its defects, either did not work properly or was unexpectedly harmful. *Lorfano*, 569 A.2d at 197. As previously discussed, there is no genuine dispute that the Press was designed and manufactured without defects.

However, "[w]hen a product is sold without adequate warning of dangers, there is a breach of the implied warranty of merchantability." 63 Am. Jur. 2d Products Liability § 671. As discussed above, there are genuine issues of material fact whether Nichols's removal of the bottom platen fill adjustment shaft and its change to a two-person set-up process were foreseeable and whether the pinch point hazard was obvious and apparent. Thus, there are a genuine issues of fact regarding whether Defendant knew or should have know of the danger of the pinch point hazard at the time the Press was sold, necessitating a warning. *See Lorfano*, 569 A.2d at 197. Therefore, there is a genuine issue of material fact regarding the whether the Press was fit for its ordinary purpose and merchantable.

Regarding the implied warranty of fitness for a particular purpose, the plaintiff must establish, among other requirements, that "the purchaser had a particular purpose outside the scope of ordinary purposes" and "the seller, at the time of contracting, has reason to know of the

19

particular purpose." *Lorfano*, 569 A.2d at 197; 11 M.R.S. § 2-315. A "particular purpose" is "a specific use by the buyer which is peculiar to the nature of his business." 11 M.R.S.A. § 2-315 U.C.C. cmt. 2 (1964); *see also* Simmons, Zillman, & Gregory, *Maine Tort Law* § 12.19 at 12-29.

Plaintiff has failed to put forth sufficient facts demonstrating that Nichols had a particular purpose for the Press outside the scope of its ordinary purpose at the time the Press was sold. In his opposition brief, Plaintiff simply asserts, "Defendant knew what Nichols intended as a particular production purpose for the Press." (Pl. Opp'n to Def. Mot. Summ. J. 16.) Plaintiff cites deposition testimony from his expert, Krafchick, to support this assertion. (*Id.*; Pl. Add'l S.M.F. ¶ 23.) The cited testimony is as follows:

> Q: Okay. In Cincinnati's case, how would it know what Nichols was capable of?
>
> A: I think this is not the only press that was sold by Cincinnati to Nichols, so they had people – Cincinnati sent sales and service people to their shop. They knew what they were doing. It's a very specialized industry. It's highly technical. They have – just in my brief localized tour, they had a lot of machinery doing what they do to make parts for the automotive trade and I think anyone would come to the conclusion that they are a sophisticated user and they were certainty capable of making modifications.

(Krafchick Dep. 39:18-40:4.) Nothing in this testimony speaks of whether Nichols had a particular purpose for the Press outside the scope of its ordinary purposes. Thus, the cited testimony does not supports Plaintiff's assertion that Defendant knew Nichols had a particular production purpose for the Press. Because there are no facts in the record demonstrating that Nichols had a particular purpose for the Press outside the scope of its ordinary use, Defendant is entitled to summary judgment on that claim.

## VII. Medical Causation

Lastly, Defendant argues that Plaintiff cannot establish that the accident proximately caused two of his medical conditions: ulnar impaction and carpal tunnel syndrome. (Def. Mot.

20

Summ. J. 15-16.) Plaintiff's medical expert, Sasha Matthews, M.D., diagnosed Plaintiff with ulnar impaction and bilateral carpal tunnel syndrome. (Def. Supp'g S.M.F. ¶ 35; Matthews Dep. 18:18-21.) Dr. Matthews initially opined that Plaintiff's conditions were a direct and proximate result of the October 20, 2009 incident. (Matthews Dep. 7:18-24.) However, regarding Plaintiff's ulnar impaction, Dr. Matthews testified at deposition that, although the condition could be caused by trauma, more often than not, it is caused by the way a person grows and develops. (*Id.* at 21:8-17.) Dr. Matthews testified that, due to length of a person's unla bone, the bone can over time wear down the tissue between the ulna and lunate. (*Id.* at 21:22-22:14.) Dr. Matthews testified that length of Plaintiff's ulna was not caused by the incident at Nichols and that Plaintiff's ulnar impaction "was there from the beginning and has been developing and progressing his entire life." (*Id.* at 21:18-21, 23:15-17.)

Regarding Plaintiff's carpal tunnel syndrome, Dr. Matthews's initial opinion that the October 20, 2009 incident caused Plaintiff's carpal tunnel syndrome was based on Plaintiff's report that his wrists had been crushed. (Def. Supp'g S.M.F. ¶ 38; Matthews Dep. 26:4-9.) However, after reviewing additional photographs, x-rays, and reports of Plaintiff's injuries during deposition, Dr. Matthews changed his opinion. (*Id.* ¶ 39; Matthews Dep. 26:4-27:13.) Dr. Matthews conceded that none of the pictures or diagrams showed a crush injury to Plaintiff's wrists. (*Id.* ¶ 36; Matthews Dep. 34:10-12.) Dr. Matthews testified, "Given the paucity of swelling around the time of the injury, it seems less likely that the carpel tunnel symptoms were caused by the crushing injury." (Matthews Dep. 27:11-13.) Dr. Matthews conceded that, based on the new data presented during his deposition, he could not state that it was more probable than not that Plaintiff's carpal tunnel syndrome was caused by the events of October 2009. (Def. Supp'g S.M.F. ¶ 40; Matthews Dep. 28:15-20.)

In opposition, Plaintiff cites Rapp's testimony that Plaintiff's hands immediately swelled after the accident. (Pl. Add'l S.M.F. ¶ 35.) Plaintiff asserts that Dr. Matthews testified that, if there was significant swelling from a more distal compression, it could still cause carpal tunnel syndrome, and that, if Plaintiff sustained a significant crush injury in the same area he sustained lacerations, then the injury could be the cause of Plaintiff's carpal tunnel syndrome. (Pl. Add'l S.M.F. ¶¶ 34, 36.) Although Dr. Matthews did testify that distal swelling was a possible cause, Dr. Matthews clearly conceded that distal swelling was not the probable cause of Plaintiff's carpal tunnel syndrome. Dr. Matthews stated, "Certainly with the crushing injury being more distal, it makes it less likely that it's a more direct cause of the carpel tunnel." (Matthews Dep. 27:20-22.) Dr. Matthews conceded that he could not state that it was more probable than not that Plaintiff's carpal tunnel syndrome was caused by the events of October 2009. (Matthews Dep. 28:15-20.)

Plaintiff also cites deposition testimony from Defendant's designated medical expert, Alexander L. Mesrobian, M.D. [6] (Def. Add'l S.M.F. ¶¶ 28, 38.) In the cited testimony, Dr. Mesrobian stated that he had no doubt that Plaintiff sustained "an injury of some magnitude", but that he had difficultly describing the extent of that injury. (*Id.* ¶ 38; Mesrobian Dep. 24:13-19.) Dr. Merobian testified that, in his opinion, Plaintiff suffered "crush injuries to both hands, aggravating hand pain and some osteoarthritic details" as result of the accident, but he could not

---

[6] Defendant objects to Plaintiff's use of Dr. Mesrobian's testimony to support its claims on summary judgment. (Def. Reply to Pl. Add'l S.M.F. ¶¶ 28, 38.) Defendant argues, "Plaintiff is not permitted to attempt to use Dr. Mesrobian as an expert witness in order to meet his medical causation burden. The Plaintiff did not designate Dr. Mesrobian, and only properly designated a single medical expert, namely Dr. Matthews." (*Id.*) Defendant also asserts that Plaintiff's use of Dr. Mesrobian's testimony violates the "one expert per issue" rule. (*Id.*) As discussed below, none of Dr. Mesrobian's cited testimony is evidence that the accident proximately caused Plaintiff's ulnar impaction or carpal tunnel syndrome. Therefore, the court need not address Defendant's objection.

22

say how long Plaintiff's symptoms would last. (*Id.* ¶ 28; Mesrobian Dep. 47:16-48:7.) Although Dr. Mesrobian concedes that Plaintiff likely suffered some injury as a result of the accident, none of the cited testimony addresses Plaintiff's ulnar impaction or carpal tunnel syndrome. Therefore, none of Dr. Mesrobian's cited testimony is evidence that the accident proximately caused Plaintiff's ulnar impaction or carpal tunnel syndrome.

Plaintiff also cites medial records from four prior treating physicians. (Pl. Add'l S.M.F. ¶¶ 29-32.) Defendant objects to the court's consideration of the medical records, asserting that the records constitute inadmissible hearsay. (Def. Reply to Pl. Add'l S.M.F. ¶¶ 29-32.) Title 16 M.R.S. § 357 provides in relevant part:

> Records kept by hospitals and other medical facilities licensed under the laws of this State... shall be admissible, as evidence in the courts of this State so far as such records relate to the treatment and medical history of such cases and the court shall admit copies of such records, if certified by the persons in custody thereof to be true and complete, but nothing therein contained shall be admissible as evidence which has reference to the question of liability.

16 M.R.S. § 357. Medical records may also be admissible under the business records exception to the hearsay rule, Maine Rule of Evidence 803(6). *See State v. Archer*, 2011 ME 80, ¶ 10, 25 A.3d 103; Field & Murray, *Maine Evidence* § 803.6 at 487 (6th ed. 2007). In order to be admissible pursuant to the business records exception, a custodian or qualified witness must attest that each medical record meets the requirements for admissibility. M.R. Evid. 803(6)(D). Plaintiff has not provided any testimony from a custodian or qualified witness attesting to the accuracy or completeness of the cited medical records or how the medical records were made and kept. (Pl. Add'l S.M.F. ¶¶ 29-32.) Thus, the records are not of a quality admissible at trial in order to be considered on summary judgment. *See Beneficial Me. Inc. v. Carter*, 2011 ME 77, ¶ 10, 25 A.3d 96. Even the if the court were to consider the cited medical records, it is not clear to the court whether these records create a genuine issue of material fact regarding whether the

23

accident proximately caused Plaintiff's ulnar impaction or carpal tunnel syndrome. Plaintiff has not provided any expert testimony to help the court understand cited the evidence.

Based on the foregoing, Plaintiff has failed to put forth prima facie evidence that the accident proximately caused Plaintiff's ulnar impaction or carpal tunnel syndrome. Although there may be genuine issues of material fact regarding the nature and extent of Plaintiff's injuries resulting from the accident, there is no genuine issue of material fact for trial regarding Plaintiff's ulnar impaction or carpal tunnel syndrome. Therefore, Defendant is entitled to partial summary judgment on any claims for damages for Plaintiff's ulnar impaction or carpal tunnel syndrome.

## **CONCLUSIONS**

Defendant Cincinnati Incorporated's motion for summary judgment on all claims by Plaintiff Spiro Basha is granted in part and denied in part as follows:

(1) Defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** as to Counts I and II for strict liability and negligence. Summary judgment is granted as to any claims based on a manufacturing or design defect. Summary judgment is denied as to any claims based on a failure to warn.

(2) Defendant's motion for summary judgment is **GRANTED** as to Count III for design defect.

(3) Defendant's motion for summary judgment is **DENIED** as to Count IV for failure to warn.

(4) Defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** as to Count V for breach of implied warranties. Summary judgment is granted on

24

Plaintiff's claim for breach of the implied warranty of fitness for a particular purpose. Summary judgment is denied on Plaintiff's claim for breach of the implied warranty of merchantability.

(5) Defendant's motion for summary judgment is **GRANTED IN PART** as to all Counts regarding claims for damages for Plaintiff's ulnar impaction or carpal tunnel syndrome.

Accordingly, Counts I, II, IV, and V of Plaintiff Spiro Basha's complaint remain partially pending.

The Clerk is instructed to enter this Order on the docket for this case incorporating it by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: 5/4/17

Richard Mulhern
Judge, Business & Consumer Court

25